On the Merits
The trial court, with written reasons, concluded that the plaintiff had entered into negotiations with the defendant, Fakouri, and that this defendant caused him to believe he could farm the rice allotment for the year 1957 on Fakouri’s tract of land. Also, and the record so discloses, any negotiations were made with the understanding that a written lease would be executed. One was prepared but was never executed. The plaintiff went to Opelousas to execute the lease and contends Fakouri, at that time, told him the lease was lost and there was no reason to have one. Fakouri strenuously denies making such a statement but it seems clear that from about August of 1956 through January of 1957, both Fakouri and the plaintiff contemplated the plaintiff would farm the property during the 1957 rice crop year.
The defendant, McCauley, had farmed the same tract of land during the year 1956 and for several years prior thereto. In' February of 1957 the defendant, Fakouri, and the defendant, McCauley, entered into a written lease covering the property.
The primary question is whether McCauley caused or assisted or encouraged Fakouri to break any verbal lease if such was extant, or committed a “trespass” under Article 165 of the Code of Practice, supra.
The plaintiff, while admitting he would not normally be liable to any original lessee where no written lease had been executed and recorded, charges McCauley had actual knowledge that plaintiff had a lease on the land in question and if he had no actual knowledge then he certainly had constructive knowledge. He bases actual and positive knowledge upon the fact that the plaintiff plowed a certain part of the land and split posts and also made publication of a “no hunting” notice. There is no question but that McCauley knew Fakouri had been dealing with the plaintiff, and also knew that the plaintiff’s father had plowed a certain part of the tract and that someone had split around 300 fence posts. The lower court held this was insufficient to place McCauley on notice that Fakouri had entered into a lease with the plaintiff. The *467 plaintiff himself admitted he had not told McCauley of any negotiations between himself and Fakouri. The lower court concluded there was not sufficient evidence to apply the provisions of Article 2324 of the LSA-Civil Code. This article reads:
“He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act.”
McCauley denied any knowledge of any agreement between the plaintiff and Fa-kouri and stated that he did not know for whom the plaintiff’s father plowed the land and he did not discuss this matter with Tate, his father or Fakouri.
We, as did the trial court, found insufficient evidence in this record to hold Mc-Cauley under the provisions of Article 2324 of the LSA-Civil Code, supra. No lease was recorded between plaintiff and Fakouri, and McCauley when he entered into a written and recorded lease with Fakouri had the right to rely upon the faith of the public records.
Article 2266 of the LSA-Civil Code provides :
“All sales, contracts and judgments affecting immovable property, which shall not be so recorded, shall be utterly null and void, except between the parties thereto. The recording may be made at any time, but shall only affect third persons from the time of the recording.
“The recording shall have effect from the time when the act is deposited in the proper office, and indorsed by the proper officer.”
McDuffie v. Walker, 125 La. 152, 51 So. 100 holds than an innocent third person when dealing on the faith of the public records is not affected by knowledge acquired by him de hors the record. Gonsoulin v. Sparrow, 150 La. 103, 90 So. 528, 529, also is authority that the mere knowledge of want or right on the part of the record owner to sell does not constitute fraud. Therein we find:
“In other words, that mere knowledge of the want of right on the part of the record owner to sell does not constitute fraud such as cuts down everything. In the present case there is neither allegation nor proof of even actual knowledge, but only a contention that the circumstances were of a nature to put plaintiff upon inquiry.”
In State ex rel. Winn v. Sinclair Refining Co., La.App., 25 So.2d 543, 547, this language is found:
“Some attempt was made to establish relator’s knowledge of the existence of the lease which is sought to be canceled from the record, but, unquestionably, any knowledge of this character was acquired de hors the record, and, consequently, did not affect relator’s status as a third party purchasing on the faith of the public records.”
Also see Buras Ice Factory Inc. v. Department of Highways, 235 La. 158, 103 So.2d 74.
The knowledge which registry and public records afford cannot be changed or altered except on account of fraud or other similar impositions. See Tensas Delta Land Co. v. Fleischer, 132 La. 1021, 62 So. 129, and authorities cited therein. In the case at bar the only evidence that McCauley had knowledge of any negotiations between Fakouri and the plaintiff is that he introduced Fakouri to a third person as the plaintiff’s “boss.” This was in the latter part of 1956. Also, Tate, the plaintiff, definitely stated he had never told McCauley of any negotiations between him and Fa-kouri.
The plaintiff claims that the advertisements prohibiting hunting on the lands in question, which included Tate!s name thereon, should have placed McCauley upon notice that the plaintiff had some agreement *468 with Fakouri. This is of not enough significance to form a basis for fraud on the part of McCauley and there is nothing in this record to show fraud upon his part. At the time McCauley executed and recorded the lease with Fakouri there was no lease of record between Fakouri and the plaintiff, and in the absence of any further proof than found in this case McCauley could rely upon the public records and enter into a written lease with the landowner.
Under the evidence adduced the case should be dismissed as against the defendant, McCauley.
The secondary question, since the local court had jurisdiction of a .suit for damages against Fakouri, the land owner, is whether a verbal lease was proven between plaintiff and Fakouri and if so, what damages were suffered by the plaintiff.
Article 2683 of the LSA-Civil Code states that: “Leases may be made either by written or verbal contract.”
A resume of the testimony of the plaintiff shows that Fakouri, the owner of the land, came to plaintiff's home in August of 1956 and offered to lease the farm to Tate for the crop year 1957. On the following Sunday Fakouri returned to Tate’s home, requesting a written contract and he then asked Tate to secure a contract and he would come and read it when it was prepared. The plaintiff, Tate, then had a contract of lease prepared by Mr. Gilbert Vidrine of Ville Platte and he telephoned Fakouri that the lease was ready. Fakouri returned to see Tate, and they both read the contract. A copy of this contract was introduced into the record as plaintiff’s exhibit. Tate stated the contract was satisfactory to Fakouri except for the term, which had been set at 3 years. Fakouri took the original of the lease, stating he would have his attorney change the term of the lease and would also have inserted a clause providing that if Fakouri cancelled the contract at the end of one year he would reimburse Tate for the cost of making a canal upon the property. Tate agreed to meet Fakouri at his office the following week to sign the contract. When he went to Fakouri’s office Fakouri told him he had lost the contract but that Tate need not worry as Fakouri would keep his word. Tate, during this discussion, agreed to plow the land when the cattle of McCauley were removed therefrom.
Fakouri denied, most of the testimony of Tate but admitted he saw him about building a fish pond; that Tate kept requesting a lease upon the premises in question but that he told him “to get through with the fish pond, then we’ll talk with the other thing.” Fakouri admitted he had discussed renting the place with Tate but that they had not agreed upon the rent, and that Tate had said at that time it was all right to let McCauley have the land. However, on cross examination he admitted this conversation had happened in a previous year and not for the 1957 rice crop year.
Mr. A. V. Guillory, who was Chairman of the Parish P. M. A. Committee, testified it was the custom in the vicinity to have verbal leases and that such contracts were usually entered into in the latter part of August in the year preceding the rice harvest.
Mr. Delton Guillory, a brother-in-law of Tate, stated he had heard part of the conversation between Fakouri and Tate at Tate’s home in August of 1956; that he had heard Fakouri tell Tate he wanted to lease him the land; that he did not hear the actual terms since both Tate and Fakouri walked away from him. This witness further testified that while- he was hunting with Fakouri in December of 1956 Fakouri told him he was very happy that Tate had already commenced work upon the premises.
Mr. Alcius Fuselier, who was the County Office manager of the A. S. C. in Evangeline Parish, stated that during December *469 of 1956 or possibly January of 1957, Fakou-ri went to see him and discussed combining his rice acreage so it would all be planted •on the premises in question. At that time Fakouri stated that Tate would plant the trice. This witness gave as his reason for recollecting these events that Tate went to his home and told him when Fakouri advised him he could not plant the premises.
Another witness, James Ortego, stated he knew nothing about any lease between Fakouri and Tate but that in January or February of 1957 Fakouri gave him a written message to bring to Tate and that Fakouri waited in an automobile in front ■of Tate’s house while this written message was delivered. He remembered that Tate was not home and that he gave the message to Mrs. Tate and told her that the contract was for 29j4 acres of rice.
There was introduced by the plaintiff in -evidence copies of a local paper of September 21, 1956, which shows a “no hunting or trespassing” notice concerning the land in question, which was signed by John Fakouri and Tate, the plaintiff.
Also introduced was a letter from Fakouri written and received in February of 1957 wherein Fakouri stated Tate had not followed his instructions and that he had told Tate not to begin work until further notice. Further, “under the circumstances which prevail, now, I may find it ■ difficult to locate a man to take the place.”
According to Tate’s testimony that he would plow the land as soon as the cattle -of McCauley were removed, he did plow 17 .acres of land and assumed that Fakouri had told McCauley to remove his cattle.
In addition to plowing the 17 acres, Tate employed 2 men and worked himself, one day splitting 300 posts to be used on the premises, all at Fakouri’s instructions.
A thorough examination of the record . and the testimony introduced lead us to the ■ conclusion there was a verbal lease between Tate and Fakouri and that Fakouri is an-swerable in damages for the breach thereof.
Leases may be verbal, Article 2683, LSA-Civil Code, supra, and the lessor, Fakouri as an incident to this verbal lease, was bound to cause the plaintiff to be maintained in peaceful possession. Article 2692 of the LSA-Civil Code reads:
“The lessor is bound from the very nature of the contract, and without any clause to that effect: * * * 3. To cause the lessee to be in a peaceable possession of the thing during the continuance of the lease.”
Article 1930, LSA-Civil Code, provides:
“The obligations of contracts extending to whatsoever is incident to such contracts, the party who violates them, is liable, as one of the incidents of his obligations, to the payment of the damages, which the other party has sustained by his default.”
The evidence reflects that the following damages are allowable to plaintiff for defendant Fakouri’s breach of his lease:
Plaintiff should be allowed damages for the loss of the profits of the rice crop, as demanded. The Government allotment of rice was only 17 acres when the agreement was made, and the plaintiff introduced testimony showing that the yield would have been 15 barrels or more per acre dry weight; the evidence further shows that the sales price of the rice would have been $8.40 per barrel dry weight from which should be deducted $2.40 for drying and storage. These drying and storage expenses were to be deducted pro rata between the tenant and the landowner, which means that there would have been a net of $6 per barrel for the rice which was to be grown on the place. The net yield under these figures would have been 255 barrels at $6 per barrel, or $1,530 from which Fakouri was entitled under his lease to the sum of $306 or one-fifth which means that from the sales price of the -rice the plaintiff would have received $1,224. From this figure, however, must be deducted the *470 cost of making the rice, tractor repairs, labor, etc. which plaintiff estimated to be $3 per barrel, which expense was to be borne solely by the tenant, or a total of $765 to be deducted. Thus, plaintiff’s net profits from the rice crop on the leased acreage would have been approximately $659.
Plaintiff also demands damages for the loss of pasturage privileges, as under the proposed lease he was to be permitted to pasture his cattle upon the property in return for giving the defendant landowner one-fifth of the calves born. Under the evidence in this record, we think the fairest basis of the award would be to allow the plaintiff the damages for the loss of pasturage rights for 20 head of cattle demanded at the rate of $1.50 per head per year which the uncontradicted evidence in the record indicates to be the value of such pasturage rights. Recovery is therefore allowable to plaintiff upon this item for the sum of $30.
Plaintiff is further to be allowed the cost of his construction of a canal upon Fakou-ri’s land, which the uncontradicted evidence reveals to be $153, as by the terms of the oral lease between the parties plaintiff was to be entitled to be reimbursed for such cost of the lease was not renewed at the end of one year.
The plaintiff further seeks damages for the cost of plowing 17 acres of land, for the cost of 300 fence posts to be used in repairing the fences around the property. Since so far as the evidence indicates such expenses were contemplated to be borne by the tenant as a part of the consideration furnished for the lease and in order to make his rice crop and to exercise his pasturage rights, we do not think that any recovery should be allowable upon these items.
Likewise, plaintiff requests damages for the mental worry, the inconvenience, and the loss of his time occasioned by defendant’s breach of the lease, as well as for damages for plaintiff’s reputation. There is no evidence in the record to justify any allowance of damages for these items.
Thus the total of proven damages allowable to plaintiff is $842.
The judgment of the district court is amended to overrule the exception of no cause of action and the plea to the jurisdiction, affirmed in dismissing the suit against the defendant, McCauley, and overruled in that it dismisses the suit against the defendant, John Fakouri.
It is now ordered, adjudged and decreed that there be judgment in favor of Etelle Tate and against John Fakouri in the full sum of $842 with legal interest thereon from date of judicial demand, plus all costs of these proceedings.